UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TYLER HAEGELE,                              )
                                            )
                    Plaintiff,              )
                                            )
            v.                              )       No.  4:19 CV 2386 CDP
                                            )
ANDREW M. SAUL,                             )
Commissioner of Social Security,            )
                                            )
                    Defendant.              )

## MEMORANDUM AND ORDER

Plaintiff Tyler Michael Haegele[1] brings this action under 42 U.S.C. § 405(g)

seeking judicial review of the Commissioner's denial of her application for

disability insurance benefits (DIB) under Title II of the Social Security Act, 42

U.S.C. §§ 401, *et seq*., and supplemental security income (SSI) under Title XVI,

42 U.S.C. §§ 1381 *et seq*.  Because the Commissioner's final decision is supported

by substantial evidence on the record as a whole, the decision is affirmed.

## I.      Procedural History

On August 5, 2016, Haegele filed applications for DIB and SSI benefits.  In

her applications, Haegele alleged a period of disability beginning on February 11,

---

[1] Ms. Haegele is transgender and uses the pronouns "she" and "her."

2016.  As disabling medical conditions Haegele listed connective tissue disorder, asthma, anemia, repeated pneumothoraces, depression, obsessive compulsive disorder, panic disorder, social anxiety, insomnia, and attention deficit disorder. (Tr.179)  The applications were denied on December 9, 2016.  Haegele timely filed an appeal for a hearing by an Administrative Law Judge (ALJ) on January 24, 2017, and a hearing was held on August 1, 2018, at which Haegele and a vocational expert testified.  On November 28, 2019, the ALJ issued a decision finding that Haegele was not disabled.  Haegele appealed the ALJ's decision on December 21, 2018.  The Appeals Council denied Haegele's request for review on June 22, 2019, and so the decision of the ALJ is the final decision of the Commissioner.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

## II.   Evidence Before the ALJ

With regard to Haegele's medical records and other evidence of record, the Court adopts Haegele's Statement of Facts, ECF 18-1, as supplemented by the Commissioner's Response to Haegele's Statement of Facts, ECF 21-1, and the Commissioner's Statement of Additional Facts.  ECF 21-2.  The Court's review of the record shows that the adopted facts are accurate and comprehensive.  Specific facts will be discussed in the following Discussion section as needed.

2

## Discussion

A. <u>Legal Standard</u>

To be eligible for benefits under the Social Security Act, Haegele must prove that she is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines 'disability' as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner engages in a five-step evaluation process to determine whether a claimant is disabled. See 20 C.F.R. § 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Goff v. Barnhart,* 421 F.3d 785, 790 (8th Cir. 2005). At Step One, the ALJ determines whether the claimant is currently engaged in substantial gainful

activity.  At Step Two, the ALJ considers whether the claimant has a "severe" impairment or combination of impairments.  At Step Three, the ALJ determines whether the severe impairment(s) meets or medically equals the severity of a listed impairment; if so, the claimant is determined to be disabled, and if not, the ALJ's analysis proceeds to Step Four.

At Step Four of the process, the ALJ must assess the claimant's residual functional capacity (RFC) – that is, the most the claimant is able to do despite her physical and mental limitations, *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) – and determine whether the claimant is able to perform her past relevant work.  *Goff*, 421 F.3d at 790 (RFC assessment occurs at fourth step of process).  If the claimant is unable to perform her past work, the Commissioner continues to Step Five and determines whether the claimant, with her RFC and other vocational factors, can perform other work as it exists in significant numbers in the national economy.  If so, the claimant is found not disabled, and disability benefits are denied.

The claimant bears the burden through Step Four of the analysis.  If she meets this burden and shows that she is unable to perform her past relevant work, the burden shifts to the Commissioner at Step Five to produce evidence demonstrating that the claimant has the RFC to perform other jobs in the national

economy that exist in significant numbers and are consistent with her impairments

and vocational factors such as age, education, and work experience.  *Phillips v.*

*Astrue*, 671 F.3d 699, 702 (8th Cir. 2012).

The Court must affirm the Commissioner's decision if it is supported by

substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Jones v. Astrue*,

619 F.3d 963, 968 (8th Cir. 2010).  Substantial evidence is less than a

preponderance but enough that a reasonable person would find it adequate to

support the conclusion.  *Id*.  Determining whether there is substantial evidence

requires scrutinizing analysis.  *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir.

2007).  To that end, I must consider evidence that supports the Commissioner's

decision, as well as any evidence that fairly detracts from the decision.  *Boyd v.*

*Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016).  If, after reviewing the entire record,

it is possible to draw two inconsistent positions and the Commissioner has adopted

one of those positions, I must affirm the Commissioner's decision.  *Id*.  I may not

reverse the Commissioner's decision merely because substantial evidence could

also support a contrary outcome.  *Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8th

Cir. 2017).  This statutory standard of review defers to the presiding ALJ, "who

has seen the hearing up close."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1157 (2019).

B. The ALJ's Decision

The ALJ determined that Haegele met the insured status requirements of the Social Security Act through June 30, 2017, and that Haegele had not engaged in substantial gainful activity since February 11, 2016.  (Tr. 14.)  The ALJ determined that Haegele had the severe impairments of major depressive disorder; generalized anxiety disorder (GAD); pneumothorax; and connective tissue disease.  The ALJ further found that Haegele had the impairments of gender dysphoria and mild intermittent asthma, but he determined that these impairments were non-severe, and that the conditions did not significantly limit her ability to perform basic work activities.  (*Id*.)  At Step Three, the ALJ determined that Haegele did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 14-16.)

After considering the entire record, the ALJ determined that Haegele had the RFC to perform sedentary work as defined in 20 CFR 202.1567(a) and 416.967(a) except that she

> can lift up to 10 pounds occasionally.  She can stand/walk for about 2 hours and sit for up to 6 hours in an 8-hour workday, with normal breaks.  She can occasionally climb ramps or stairs, but never climb ladders, ropes or scaffolds.  She can occasionally balance, stoop, kneel, crouch and crawl.  She should avoid exposure to irritants such as fumes, odors, dust, gases and poorly ventilated areas.  She should avoid exposure to operational control of moving machinery,

unprotected heights and exposure to hazardous machinery.  Her work
is limited to simple, routine and repetitive tasks.

(Tr. 17.)  The ALJ determined that Haegele did not have any past relevant

work.  (Tr. 22.)  Considering Haegele's RFC and her age, education, and

work experience, the ALJ found vocational expert testimony to support a

conclusion that Haegele could perform work as it exists in significant

numbers in the national economy, and specifically, as an optical goods

assembler or touch up circuit board worker.  (Tr. 23.)  The ALJ thus

concluded that Haegele was not disabled as defined by the Social Security

Act.  (*Id*.)


C. <u>Medical Opinion Evidence</u>

The record before the ALJ contained treatment notes and medical source

statements (MSS) from Haegele's treating psychiatrist, Gayatriben Gadani, M.D.,

and treating psychologist, Patricia Berne, Ph.D.  The record also contained reports

from two non-examining State agency consultants, Christopher Fletcher, M.D., and

Stephen Scher, Ph.D., both of whom submitted their reports in December 2016.  In

his written decision, the ALJ accorded some weight to the opinion of Dr. Fletcher

and significant weight to the opinion of Dr. Scher.  As for Haegele's treating

providers, the ALJ accorded some weight to the opinion of Dr. Gadani, and little

weight to the opinion of Dr. Berne.  In her appeal of the Commissioner's decision, Haegele argues that the ALJ erred by failing to give appropriate deference to the opinions of her treating providers, and that he further erred by discounting their opinions without discussing the weighing factors set forth in 20 CFR 404.1527.

Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairment(s), including her symptoms, diagnoses, and prognoses; what she can still do despite her impairments; and her physical and mental restrictions.  20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1) (2017).[2]  The Regulations require that more weight be given to the opinions of treating sources than other sources.  *Willcockson v. Astrue,* 540 F.3d 878, 880 (8th Cir. 2008); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  A treating source's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Forehand v. Barnhart*, 364 F.3d 984, 986

---

[2] In March 2017, the Social Security Administration amended its regulations governing the evaluation of medical evidence.  For evaluation of medical opinion evidence, the new rules apply to claims filed on or after March 27, 2017.  *See* 20 C.F.R. §§ 404.1520c, 416.920c.  Because the claims under review here were filed before March 27, 2017, I apply the rules set out in 20 C.F.R. §§ 404.1527 and 416.927.

(8th Cir. 2004).  This is so because a treating source has the best opportunity to

observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most
> able to provide a detailed, longitudinal picture of [a claimant's]
> medical impairment(s) and may bring a unique perspective to the
> medical evidence that cannot be obtained from the objective medical
> findings alone or from reports of individual examinations, such as
> consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

When a treating source's opinion is not given controlling weight, the

Commissioner must look to various factors in determining what weight to accord

that and any other medical opinion of record, including the length of the treatment

relationship and the frequency of examination, the nature and extent of the

treatment relationship, whether the source provides support for their findings,

whether other evidence in the record is consistent with the source's findings, and

the source's area of specialty.  20 C.F.R. §§ 404.1527(c), 416.927(c).  The

Commissioner "will always give good reasons in [the] notice of determination or

decision for the weight [given to the] treating source's opinion."  20 C.F.R. §§

404.1527(c)(2), 416.927(c)(2).

### 1. Medical Opinion of Dr. Gadani

On June 18, 2018, Dr. Gadani completed a mental MSS in which she opined

that Haegele faced "moderate" or "marked" limitations in each of the functional

categories represented on the form, and that Haegele's limitations had existed since December 7, 2017, which was the date of their first treatment session.  (Tr. 408.)  Dr. Gadani identified Haegele's diagnoses of Recurrent Major Depressive Disorder in partial remission, mixed obsessional thoughts and acts, and GAD.  Dr. Gadani wrote that Haegele had exhibited signs and symptoms including:  "[History of] recurrent scratching to the point of bleeding, nail biting, ripping nails and tearing the skin off in the past.  [History of] impulsively throwing things and getting out of control for a few hours with severe depression in the past."  (Tr. 408.)

In his written decision, the ALJ afforded only "some weight" to Dr. Gadani's opinion that Haegele faced a "moderate limitation" in concentration, persistence, and pace.  (Tr. 21.)  The ALJ stated that the opinion was "quite conclusory, providing very little explanation of the evidence relied on in forming that opinion." (Tr. 21.)  The ALJ rejected Dr. Gadani's assessment that Haegele would be off production 11-20% below average and miss work as a result of her mental impairments, concluding that there was "no evidence" to support the opinion.  The ALJ further found that the opinion was inconsistent with Dr. Gadani's records of mental status examinations conducted during Haegele's treatment sessions.  (*Id*.)

The ALJ indicated that he "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927." (Tr. 17.)  Although he did not discuss each of the factors in detail, I nonetheless find that the ALJ did not err in affording less than controlling weight to Dr. Gadani's opinion, and that he properly explained his reasons for doing so.

Haegele was treated by Dr. Gadani only three times, all between December 7, 2017 and April 23, 2018.  (Tr. 394, 389, 380.)  Dr. Gadani performed a mental status examination on each visit, and all three examinations reflected the same observations—Haegele's calm, kempt appearance; normal, attentive, cooperative, open and engaged attitude; normal speech; good mood; euthymic and congruent affect; sequential, logical, and goal-directed thought processes; normal thought content, including no suicidal ideation or hallucinations; good insight; good judgment; alert and oriented to person, place, and time; normal intellect with good abstraction; intact recent memory and recall; and a stable gait with no muscle weakness or atrophy.  (Tr. 394-95, 389, 380.)

In her first session with Dr. Gadani, Haegele reported her history of severe mental illness, including bipolar disorder, GAD, borderline personality disorder, OCD, and ADD, as well as the symptoms recounted by Dr. Gadani on the MSS. (Tr. 394.)  However, Dr. Gadani's treatment notes document that Haegele's mental

status was stable and well-controlled with medication, (Tr. 394), and Haegele

personally reported that her depression and related conditions seemed to be

improving on each successive visit.  (Tr. 389, 380.)  On January 25, 2018, Dr.

Gadani additionally noted that Haegele had "no depression symptoms or [suicidal

ideation]," and documented her major depressive disorder as in "partial remission."

(Tr. 389.)  "An ALJ may give less weight to a conclusory or inconsistent opinion

by a treating physician." *Larson v. Colvin*, 807 F.3d 962, 965 (8th Cir. 2015)

(citation omitted).  The ALJ correctly assessed Dr. Gadani's opinion as conclusory

and partially inconsistent in light of the contrary evidence presented in her

treatment notes, and substantial evidence thus supports his decision to afford

"some weight" to Dr. Gadani's opinion.

    2.  <u>Medical Opinion of Dr. Berne</u>

On June 30, 2018, Dr. Berne completed an MSS in which she opined that

Haegele faced "marked" or "extreme" limitations in every functional category; that

Haegele's pace of production would be 31% or more below average; that her

psychological symptoms would cause Haegele to miss work or be late for work

three times a month or more; and that Haegele was essentially incapable of

interacting with coworkers, supervisors, and the general public in any work setting.

(Tr. 410-11.)  Dr. Berne stated that Haegele had faced these limitations since 2005. (Tr. 412.)

The ALJ afforded "little weight" to Dr. Berne's opinion.  (Tr. 21.)  As with Dr. Gadani's MSS, the ALJ determined that Dr. Berne's opinion was "quite conclusory," and that Dr. Berne provided "very little explanation of the evidence relied on in forming [her] opinion." [3]  (*Id.*)  The ALJ further found that the opinion was inconsistent with Dr. Berne's treatment notes, which indicated that Haegele's medications were stabilizing her conditions and that she was able to function at home and occasionally outside the home.[4]  (*Id.*)

Haegele had a total of three appointments with Dr. Berne also, all falling between November 27, 2017 and April 13, 2018.  (Tr. 368-77.)  In each session, Dr. Berne reported symptoms including depressed mood, feelings of hopelessness,

---

[3] The Eighth Circuit has held that an ALJ may discount a checklist MSS if it contains only conclusory opinions, cites no medical evidence, and/or provides little to no elaboration, and I must apply that precedent here.  *Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) (citing *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)).  However, I note that the MSS form completed by Drs. Berne and Gadani only provided three lines to describe all of the claimant's objective signs and symptoms on which they based their opinions, and that both physicians actually exceeded the allotted space in explaining the basis for their opinions.

[4] In her appeal, Haegele claims that the ALJ fails to discuss Dr. Berne's treatment records in his opinion.  ECF 18 at pg. 6.  While cursory, the ALJ engaged in some discussion of Dr. Berne's treatment notes in his fairly detailed chronological summary of Haegele's mental health treatment.  (Tr. 20.)  "[A]n ALJ is not required to discuss every piece of evidence submitted. . . . [a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered."  *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (internal citation omitted).  Accordingly, I reject Haegele's claim to the extent she seeks to challenge the adequacy of the ALJ's development of the record as to Dr. Berne's treatment notes.

13

distractibility, suicidal ideation, social isolation, anxious mood, anxiety attacks, obsessive-compulsive behavior, labile affect, irritability, poor judgment, and isolation.  (Tr. 369, 374, 377.)  In sharp contrast with Dr. Gadani's treatment records, Dr. Berne consistently documented Haegele's prognosis as "poor," additionally noting on February 7, 2018 and April 13, 2018 that Haegele's condition had slightly worsened from previous visits.  (Tr. 374, 377.)

On April 15, 2018, Dr. Berne authored a referral letter to Mark Scheperle, M.D., in which she diagnosed Haegele with gender dysphoria and recommended that Haegele begin hormone therapy.  (Tr. 378.)  Dr. Berne discussed Haegele's history of depression, as well as her active conditions and diagnoses including her connective tissue disorder, collapsed lungs, digestive disorder, OCD, bipolar disorder, paranoid schizophrenia, social anxiety, ADHD, and possible addictive personality disorder.  (*Id*.)  However, Dr. Berne concluded:  "Right now the medicines are stabilizing these conditions and she is able to function at home and sometimes outside the home."  (*Id*.)

Upon review of the entire record, Dr. Berne's treatment notes paint a somewhat confusing and contradictory picture relative to other substantial evidence in the record.  On April 2, 2018, Haegele visited her primary care physician, Julie Busch, M.D., and reported that her medication was "working

great" and that she was in a "fabulous mental health space." (Tr. 444.) On April

23, 2018, Haegele had an appointment with Dr. Gadani and reported doing "much

better," that she had had "no depression" since her last visit on January 25, 2018,

that she was sleeping well, and that her medications were "working well." (Tr.

380.) It is difficult to reconcile these treatment notes with Dr. Berne's treatment

notes from April 13, 2018—which fell between the aforementioned treatment

sessions—wherein Dr. Berne indicated that Haegele's mental condition was

worsening and her prognosis was poor. (Tr. 377.)

Further, while Dr. Berne's opinion is consistent with her own treatment

notes in some respects, it is inconsistent with her notes, and with the record as a

whole, in several others. For instance, Dr. Berne opined that Haegele had faced

"marked" or "severe" limitations in all functional categories since 2005, yet

Haegele worked in part- to full-time employment in various retail settings for

several years before her alleged period of disability beginning on February 11,

2016. (Tr. 36-38.) An ALJ may discount the opinion of a treating physician if the

opinion suggests that the claimant faced disabling limitations during a period

where the claimant was gainfully employed. *See, e.g., Prosch v. Apfel*, 201 F.3d

1010, 1013 (8th Cir. 2000) (assessing a physician's opinion as "wholly

inconsistent" where the physician opined that a claimant's period of disability began while the claimant was engaged in substantial gainful activity.)

Dr. Berne also opined that Haegele faced "extreme limitation" in her ability to function independently and in several other functional categories, which contradicts the statements in the referral letter to Dr. Scheperle where Dr. Berne indicated that Haegele was able to function at home and sometimes outside the home, and that her conditions were stable with medication.  (Tr. 410, 378.)  "If an impairment can be controlled by treatment or medication, it cannot be considered disabling."  *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004)

A physician's opinion is only entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques *and* is not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. § 404.1527(d)(2) (emphasis added).  Dr. Berne's opinion is inconsistent with substantial record evidence, including treatment notes from Haegele's other physicians during the same time period as well as Dr. Berne's own treatment notes. The ALJ correctly assessed Dr. Berne's opinion as conclusory, lacking adequate explanation, and inconsistent in context with the entire record, thus the ALJ has satisfied his duty to provide good reasons to discount Dr. Berne's opinion.  20 C.F.R. § 404.1527(d).

D. Evaluation of Haegele's Symptoms

Next, Haegele argues that the ALJ erred by failing to properly evaluate her subjective complaints of pain and related symptoms associated with her connective tissue disorder, pneumothorax, and syncope.  Haegele testified that she is in nearly constant, debilitating pain in every system of her body due to a connective tissue disorder.  (Tr. 38.)  Haegele additionally testified that she suffers from recurring pneumothoraces which cause 15-30 minute episodes of lung contraction and chest pain; as for frequency, she testified that she has smaller pneumothorax episodes once every 2-4 days, and more severe episodes once every 2-3 weeks.  (Tr. 46-47.)  Finally, Haegele testified that she suffers from frequent syncopal episodes which cause her to "black out" for periods of time ranging from a few seconds to ten minutes, often occurring when she sits for too long and stands up to stretch.  (Tr. 45.)  I incorporate the detailed summary of Haegele's testimony before the ALJ as recounted in her brief in support of her complaint, and as summarized by the ALJ in his written opinion.  ECF 18 at pg. 7-8; Tr. 17-18.

Haegele asserts that the ALJ did not articulate a rationale or identify inconsistencies in the record which could support his decision to reject her subjective complaints.  The Commissioner responds by pointing to the ALJ's discussion of alleged inconsistencies between Haegele's testimony and her

Function Report, along with other record evidence, in support of the ALJ's
decision to discredit Haegele's testimony.

When determining a claimant's RFC, the ALJ must evaluate the credibility
of the claimant's subjective complaints. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th
Cir. 2007); *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005).  In so doing, the
ALJ must consider all evidence relating thereto, including the claimant's prior
work record and third party observations as to the claimant's daily activities; the
duration, frequency and intensity of the symptoms; any precipitating and
aggravating factors; the dosage, effectiveness and side effects of medication; and
any functional restrictions.  *Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir.
2010); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history
omitted).  The ALJ is not mechanically obligated to discuss each of the above
factors; however, when rejecting a claimant's subjective complaints, the ALJ must
make an express credibility determination detailing her reasons for discrediting the
testimony, and the ALJ's credibility assessment must be based on substantial
evidence.  *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012); *Grba-
Craghead v. Astrue*, 669 F. Supp. 2d 991, 1008 (E.D. Mo. 2009).

The ALJ determined that Haegele's medically determinable impairments of
pneumothorax and her connective tissue disease could reasonably be expected to

18

cause her alleged symptoms.  However, he found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record," and that "the evidence cannot be fully reconciled with the level of pain and limiting effects of the impairments that [Haegele] has alleged." (Tr. 18.)  In making this assessment, the ALJ indicated that he evaluated Haegele's complaints "in accordance with 20 C.F.R. 404.1529 and 416.929; and SSR 16-3p." (*Id*.) Substantial evidence supports the ALJ's finding that Haegele's testimony was somewhat inconsistent with the record evidence, and so I conclude that the ALJ did not commit reversable error in his evaluation of her symptoms.

Haegele has a history of recurring pneumothoraces in both lungs.[5]  Her pneumothorax condition is characterized by sudden onsets of chest pain and tightness due to spontaneous lung contraction.  (Tr. 325.)   Haegele was hospitalized on February 6, 2016 with complaints of chest pain and shortness of breath.  (Tr. 236.)  Her past medical history included a prior left spontaneous pneumothorax which resolved without the need of surgical intervention.  (*Id*.)  An examination revealed a small right apical pneumothorax.  (*Id*.)  Haegele was admitted to the ICU and, after the pneumothorax increased in size, she underwent

---

[5] "Pneumothorax" is the medical term for a collapsed lung.

several surgical procedures including a fiberoptic bronchoscopy with right thoracotomy, apical bleb resection, pleurodesis, and placement of a chest tube, as well as placement of an epidural catheter for pain control.  (Tr. 251.)  On observation, Haegele's other systems were normal for the duration of her hospital visit, and it was noted that her suspected Marfan's syndrome and ADHD/OCD did not present as active issues.  (Tr. 237-39.)  Haegele was discharged on February 17, 2016.  (Tr. 251.)

In a follow-up visit for her right pneumothorax, it was noted that Haegele's breathing was "fine;" while Haegele complained of mild shortness of breath while climbing flights of stairs, she denied any cough, wheezing, chest pain, or chest tightness.  (Tr. 304.)  On examination, Haegele's lungs were clear to auscultation bilaterally, with no wheezes, rhonchi, or rales.  (*Id*.)

Haegele was hospitalized again on March 2, 2017 with complaints of chest pain.  (Tr. 320.)  An examination found a small left apical pneumothorax.  (Tr. 322.)  The pneumothorax resolved without surgical intervention; Haegele was observed for 24 hours and subsequently discharged.  (*Id*.)  Although Haegele alleges that she experiences a severe pneumothorax approximately once every two or three weeks, the record reflects that she has not been hospitalized or sought treatment for the condition since March 2017.  (Tr. 47.)

Substantial evidence thus supports the ALJ's determination that Haegele's testimony concerning the limitations imposed by her pneumothorax condition could not be fully reconciled with the somewhat sparse medical record.  In other words, the spontaneous, unpredictable lung contractions Haegele experiences could certainly be expected to impose some functional limitations, but the evidence does not reflect that her pneumothoraces occur as frequently or impose the degree of debilitation that Haegele alleges in her testimony.  The ALJ's findings as to Haegele's pneumothorax-related symptoms are supported by substantial evidence.

As for Haegele's connective tissue disorder, the record reflects some confusion amongst Haegele's physicians as to her diagnosis.  (Tr. 426.)  Haegele was suspected of having Marfan's syndrome for many years, but has since received more likely diagnoses including Loeys-Dietz syndrome and Ehlers-Danlos syndrome.  (Tr. 426.)  Haegele testified that her connective tissue disorder has caused her widespread, progressively worsening pain for many years, and that the pain impacts nearly every facet of her life; however, per the Social Security Regulations, a claimant's testimony alone is insufficient to prove disability, *see* 20 C.F.R. §§ 404.1529(a), 416.929(a), and substantial evidence supports the ALJ's determination that "[t]reatment notes in the record do not sustain [Haegele's] allegations of *disabling* pain and limitations."  (Tr. 22.) (emphasis added).

As outlined by the ALJ, Haegele had a consultative examination with Austin Montgomery, M.D., on November 30, 2016.  Dr. Montgomery noted Haegele's poor musculature and tenderness in several areas throughout the lumbar area and hips, but he also observed Haegele as having normal gait and station, that Haegele was able to get on and off the table, and that she had dexterous finger control, excellent straight leg raising, and normal sensation.  (Tr. 291.)

On March 2, 2017, while Haegele was hospitalized for a left pneumothorax, Peter Fonseca, M.D. performed a physical examination of Haegele's systems and found that Haegele was negative for arthralgias, back pain, bone pain, muscle weakness, myalgias, neck pain, and stiff joints.  (Tr. 327.)  Haegele was noted to be alert, cooperative, and not in distress, with normal strength, reflexes, coordination, and gait.  (Tr. 328.)

On April 20, 2017, Haegele was seen by Marcia Willing, M.D., Ph.D., for genetic testing.  (Tr. 426.)  Haegele's myopia was classified as "mild."  (Tr. 426.)  While Dr. Willing recorded Haegele's complaints of gradually worsening pain and increased difficulty performing activities of daily living, she also noted that the pain was temporarily alleviated by pain medication, and that Haegele had not sought out physical therapy or a pain management specialist.  (Tr. 426.)  An ALJ may properly weigh conservative treatment as a negative factor while assessing a

claimant's self-reports concerning their symptoms.  *Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015).

Haegele saw Dr. Busch on October 30, 2017 and reported that her unspecified connective tissue disorder was causing widespread, gradually increasing pain, and that "everything hurt," including her back, neck, and hands. (Tr. 449.)  Haegele stated that she was taking Aleve and psych medications which temporarily helped relieve her pain.  (Tr. 449.)  Dr. Busch stated that she "was not comfortable [prescribing] pain meds for this," and she instead recommended Haegele visit Dr. Jacob Aubuchon, a specialist in connective tissue disorders.  (*Id*.) Despite the referral, the record reflects that Haegele has not sought out treatment by Dr. Aubuchon or other pain management specialists.

Haegele was also noted to walk with a stable gait, without muscle weakness or atrophy, during each of her three sessions with Dr. Gadani.  (Tr. 394-95, 389, 380.)

Finally, Haegele's Function Report also calls into question the degree of limitation that she faces due to her connective tissue disease.  In the Function Report, Haegele self-reported that she provided care for her grandmother; cooked and prepared meals several times a day; assisted with cleaning, cooking, and laundry; drove a car; shopped in stores; managed her finances; and that she

23

enjoyed singing, writing, dancing, and playing video games when she was able to do so, despite the limitations imposed by her pain symptoms.  (Tr. 15-16, 199-203, 208.)  While the ability to complete simple activities of daily living does not necessarily prove that a claimant is not disabled, such admissions may properly be held to undermine assertions of total disability.  *See, e.g., Julin v. Colvin*, 826 F.3d 1082, 1087 (8th Cir. 2016); *Ponder v. Colvin*, 770 F.3d 1190, 1195 (8th Cir. 2014).

As for Haegele's syncope condition,[6] there is evidence to suggest that her genetic disorder may cause syncopal episodes to occur, although there are inconsistencies between the medical evidence and Haegele's testimony concerning the frequency of the syncopal episodes.

Haegele saw Dr. Willing on April 20, 2017 to discuss the results of her genetic testing.  (Tr. 426.)  Test results revealed two genetic mutations which are associated with various cardiac conditions, including syncope.  (Tr. 428-29)  In her review of Haegele's symptoms, Dr. Willing noted Haegele's reports of tachycardia, skipped heartbeats, chest pain, dizziness, and syncope, and she included a notation that Haegele's syncope occurred approximately once per month in the past year.  (Tr. 427.)  However, in a follow-up visit with Dr. Willing on January 17, 2018, and during an examination by Daniel Cooper, M.D. on

---

[6] "Syncope" is a temporary loss of consciousness, typically caused by a sudden drop in blood pressure.

January 25, 2018, Haegele reported that her syncope happened one to three times per day.  (Tr. 413, 417.)  An ALJ "may decline to credit a claimant's subjective complaints if the evidence as a whole is inconsistent with the claimant's testimony." *Julin*, 826 F.3d at 1086 (citation omitted).

In sum, the ALJ thoroughly examined the available medical evidence and summarized it in detail in his written opinion, noting several inconsistencies between the record and Haegele's testimony concerning the limitations imposed by her pain symptoms.  While I believe that Ms. Haegele's conditions are more debilitating than the objective evidence currently reflects, a reasonable person would find the evidence cited by the ALJ to support his conclusions related to Haegele's subjective complaints, and so I must affirm his decision here. *See Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012).

E. RFC Analysis

Finally, Haegele argues that the RFC determined by the ALJ is conclusory and not supported by substantial evidence.  Specifically, Haegele argues that the ALJ did not identify evidence in the record to support his RFC determination that Haegele retained the capacity to perform sedentary work.

The ALJ bears "the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel,* 222 F.3d

466, 469 (8th Cir. 2000).  A claimant's RFC is a medical question, and "at least

some" medical evidence must support the RFC determination.  *Lauer v. Apfel,* 245

F.3d 700, 704 (8th Cir. 2001).  Accordingly, "the ALJ should obtain medical

evidence that addresses the claimant's ability to function in the workplace."  *Id.*

(internal quotation omitted).  However, on appeal, the Court "review[s] the record

to ensure than an ALJ does not disregard evidence or ignore potential limitations,"

rather than ensure that each and every aspect of the RFC determination is

supported by citations to specific evidence in the record.  *See Nash v. Comm'r,*

*Soc. Sec. Admin.*, 907 F.3d 1086, 1090-91 (8th Cir. 2018) (internal quotation

omitted).

          As discussed above, the ALJ thoroughly evaluated Haegele's testimony and

the available medical evidence in the record.  The ALJ also evaluated the four

medical opinions submitted by Haegele's treating physicians and the state

examiners, as well as the third-party statements submitted by Haegele's

grandmother and nephew.  (Tr. 20-21.)  Based on this evidence, the ALJ found that

Haegele's severe impairments imposed some functional limitations, which were

reflected in the RFC—namely, that she could perform only sedentary work; lift up

to ten pounds occasionally; and stand or walk for only two hours and sit for up to

six hours with normal breaks.  Further, because of Haegele's pneumothorax

condition, the ALJ imposed additional restrictions that Haegele should avoid exposure to various irritants and poorly ventilated areas.  (Tr. 17.)

As explained in his decision, the ALJ did not impose additional limitations in the RFC due to her subjective complaints of pain—nor find Haegele entirely disabled—because he properly determined that Haegele's testimony concerning the extent of her limitations was not entirely credible.  (Tr. 18.)  It is appropriate for an ALJ's determination regarding a claimant's RFC to be influenced by the ALJ's credibility findings in this manner.  *Accord Wildman v. Astrue*, 596 F.3d 959, 969 (8th Cir. 2010)).  Moreover, the ALJ properly posed hypotheticals to a vocational expert who identified occupations in the national economy of which Haegele would be capable of performing based only on the limitations the ALJ found to be supported by substantial evidence.  *See Perkins v. Astrue*, 648 F.3d 892, 902 (8th Cir. 2011) (ALJ not required to adopt claimant's "unsupported subjective complaints and self-imposed limitations.").  The ALJ's determination as to Haegele's RFC is affirmed.

F.  Conclusion

Ms. Haegele's testimony and medical records unquestionably show that she struggles with several severe physical and mental impairments.  However, there is still a great deal of uncertainty in the record surrounding the diagnosis, symptoms,

and degree of limitations caused by her as-yet unspecified genetic connective tissue disorder, and it appears from the record that her mental conditions are generally stable and well-controlled by medication.  Once again, the Court's role in appeals of this nature is quite limited—the Commissioner's decision is assessed under a highly deferential standard, and I may not reverse an ALJ's decision if it is supported by substantial evidence, even if substantial evidence may support a different outcome.  *See Anderson*, 696 F.3d at 793.  Having evaluated the entire record in detail, I find that substantial evidence on the record as a whole supports the ALJ's decision.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed, and Tyler Haegele's complaint is dismissed with prejudice.

A separate Judgment is entered herewith.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 24th day of August, 2020.